**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| ALYCIA CAPARELLI, | ) |
|               Plaintiff, | ) |
|      v. | ) |
| TOWN OF MERILLVILLE, | ) |
| LT. JAMES BOGNER, DR. ZHUO | )   No. |
| WANG, PATHOLOGY CONSULTANTS, | ) |
| INC., LAKE COUNTY, | ) |
| | )   **JURY TRIAL DEMANDED** |
|               Defendants. | ) |

**COMPLAINT**

The Plaintiff, Alycia Caparelli, by and through her undersigned attorneys, DVORAK LAW OFFICES, LLC and McHARGUE & JONES, complains against the Defendants as follows:

**JURISDICTION AND VENUE**

1. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983, § 1988, the judicial code 28 U.S.C. § 1331 and § 1343(a).

2. Upon information and belief, the Defendants reside or are located within the jurisdictional limits of the Northern District of Indiana.

3. The Town of Merrillville is located, and the events described in this Complaint occurred, in Lake County, Indiana, which falls within the Hammond Division.

**THE PARTIES**

4. Plaintiff Alycia Caparelli is a resident of Indiana who was criminally charged with the murder of her boyfriend, Timothy Riley.

5. All criminal charges were dismissed by the Lake County Prosecutor's Office on or about February 25, 2022, in a manner consistent with the Plaintiff's innocence.

6. Defendant James Bogner was at all relevant times a Merrillville Police Department police officer.

7. At all relevant times, Defendant Bogner was acting under color of state law as a law enforcement officer employed by the Merrillville Police Department and Town of Merrillville.

8. Defendant Dr. Zhuo Wang was at all relevant times a physician who was contracted by the Lake County Coroner's Office to provide autopsies and other investigative services on behalf of the Lake County Coroner's Office.

9. Defendant Dr. Wang was at all relevant times, on information and belief, an owner, employee, partner, and/or agent of Defendant Pathology Consultants, Inc., which contracted with the Lake County Coroner's Office to provide autopsies and other investigative services for the Coroner's Office.

10. At all relevant times, Defendant Dr. Wang was acting under color of state law.

11. Defendant Dr. Wang was contracted by the Lake County Coroner's Office to assist in the investigation of crimes, including but not limited to performing autopsies for deaths that occurred in Lake County, Indiana.

12. Defendant Dr. Wang exclusively works for the Lake County Coroner's Office in investigating nonnatural deaths, except for some limited work he does for the Porter County Coroner's Office.

13. Defendant Pathology Consultants, Inc. is being sued on a *respondeat superior* basis of liability as to the actions of Defendant Dr. Wang, for indemnification purposes, and also for

2

*Monell* liability for its deliberate indifference in its practices of hiring, supervising and training Defendant Dr. Wang, who Defendant Pathology Consultants, Inc. knew or should have known Dr. Wang was unqualified to conduct autopsies to determine whether deaths should be considered suicides or homicides.

14. Defendant Lake County is being sued on an indemnification theory of liability as to the actions of Defendant Dr. Wang, additionally and/or alternatively to any indemnification that may be required and/or authorized for Defendant Pathology Consultants, Inc.

15. Defendant Town of Merrillville is a municipal corporation located in the County of Lake, in the State of Indiana, and is being sued on an indemnification theory of liability as to Defendant Lt. Bogner.

## STATEMENT OF FACTS

### Timothy Riley's Known History of Suicide Attempts

16. In late 2017, Plaintiff Alycia Caparelli lived in a converted bedroom in the garage of her parents' home located in Merrillville, Indiana.

17. The Plaintiff lived in the converted bedroom with her boyfriend, Timothy Riley.

18. Before December 1, 2017, Riley suffered from severe mental health crises, which included threats to engage in self harm and prior suicide attempts.

19. Riley attempted to commit suicide on more than one occasion, the most recent of which before the events of this case was on May 10, 2017, which resulted in his hospitalization.

### Timothy Riley Shoots Himself on December 1, 2017

20. On December 1, 2017, the Plaintiff and Riley had a verbal argument in their bedroom at the home of the Plaintiff's parents.

3

21. After the Plaintiff requested that Riley leave the premises, tragically, Riley grabbed with his right hand the Plaintiff's handgun, which was on a chest of drawers in the bedroom, placed the handgun's muzzle near the right side of his head, and pulled the trigger.

22. The bullet entered Riley's brain, causing massive bleeding and catastrophic damage to his brain.

23. This was a right-to-left wound to the right side of Riley's brain by a right-handed individual, which is a classic suicide type of gunshot wound.

24. In an effort to save Riley's life, the Plaintiff immediately grabbed a piece of clothing and placed it on the entrance wound in order to attempt to stop the bleeding from Riley's head, and she also called out to her parents.

25. The Plaintiff also called 911 when her father's cell phone malfunctioned.

26. Defendant Lt. Bogner obtained and reviewed these calls as part of his investigation, before charges were initiated, and documented this in a supplemental report, so he was aware of these calls at the beginning of his investigation.

27. In her call to 911, the Plaintiff provided her address, but was frantic, yelling "I can't talk to you, Oh my God, Oh my God, I love you, You can't leave me, and Get on the phone Mom!"

28. Her mother made a follow up call to 911, indicating that her son-in-law shot himself, once again giving her address, and life-saving measures can be heard in the background, including attempts by the Plaintiff's father to provide CPR.

**The First Responders Treat the Shooting as the Obvious Attempted Suicide that It Was**

29. The first person to respond to the scene was Merrillville Police Department Officer Alexander Van Rite.

4

30. Officer Van Rite took possession of the handgun to ensure a bullet was removed from the chamber.

31. Officer Van Rite assessed the scene and concluded this was a suicide attempt.

32. Because this was an obvious suicide, Officer Van Rite thus handled the handgun without gloves and took no other efforts to preserve evidence at the scene apart from later bagging and taking possession of the handgun.

33. Paramedics arrived at the scene shortly after Officer Van Rite, and they began life-saving efforts on Riley.

34. Merrillville Police Department Sergeant Michael Gurgevich arrived upon the scene after the paramedics.

35. Sgt. Gurgevich agreed with Officer Van Rite that Riley shot himself in an attempted suicide, and thus concluded no evidence preservation efforts were needed, as no crime had been suspected.

36. Sgt. Gurgevich later explained in an August 20, 2018 police report documenting why police did not treat the Plaintiff's bedroom as a possible crime scene: "My experience with several other suicide calls, this appeared to be exactly what we had."

37. Sgt. Gurgevich also wrote in this same report, "Again all evidence at the scene that evening led me to believe it was a suicide and nothing else. If I had any doubts or reasons to believe that it was something different or suspicious, I definitely (sic) would have handled it with the proper steps and procedure."

38. Sgt. Gurgevich also noted in his report that at the time he and all of the other first responders concluded this was a suicide attempt, he also spoke to Merrillville Police Chief Petruch

5

via cell phone regarding his conclusion that it was a suicide, and the Chief of Police took no issue with Sgt. Gurgevich's conclusion or lack of scene preservation.

39. Both responding police officers, accordingly, did not place bags on Riley's hands to preserve gunpowder residue evidence because they both concluded that it was obvious that Riley had attempted to commit suicide.

40. At one point during that day, while at least one officer was at the home and the scene was being processed, Defendant Bogner became aware that this was a shooting that was being described as a suicide attempt, and he made no effort to preserve the scene as a potential crime scene.

41. The paramedics transported Riley to the hospital.

42. The Plaintiff also went to the hospital because she was suffering from a mental health crisis triggered by the foregoing events.

43. After the paramedics left the scene, Sgt. Gurgevich, Officer Van Rite, and the other responding Merrillville Police Department officers, did not instruct Plaintiff or her parents to preserve the scene of Riley's self-inflicted shooting because all of them concluded this was an obvious suicide attempt, not a potential crime scene that needed to be preserved.

44. Apart from bagging, tagging, and removing the handgun that Riley used to shoot himself from the scene, because every on-scene officer concluded this was on obvious suicide attempt, the Merrillville Police Department officers did not remove any other evidence from the scene, took no photos, and took no other efforts to preserve the scene of the shooting.

**Life-Saving Efforts Provided to Timothy Riley**

45. Life-saving efforts were made at the hospital on Riley.

6

46. These life-saving efforts by medical personnel required that the gunshot entrance wound be thoroughly cleaned.

47. These life-saving efforts by medical personnel also required Riley's hair to be shaved around the gunshot entrance wound on the right side of his head.

48. These-life saving efforts and the result of the gunshot wound resulted in a loss of brain matter, most specifically at the entrance wound an in the bullet path, since the brain matter either splattered or oozed out of the bullet path after the shooting.

49. After two days on life support, Riley had no signs of brain activity, and thus medical personnel removed him from life support and he tragically died on December 3, 2017.

## Defendant Bogner's Criminal Investigation

50. Meanwhile, the Plaintiff was hospitalized at the psychiatric ward due to her intense grief due to witnessing Riley's suicide.

51. During her hospital stay, the Plaintiff consistently informed multiple mental health professionals who provided treatment at the hospital that Riley had committed suicide, and Defendant Bogner had no credible information that would undermine this obvious conclusion.

52. The day after the shooting, on December 2, 2017, some of Riley's family members approached Defendant Bogner and stated they thought Plaintiff shot Riley, and that he was shot Riley somewhere other than Plaintiff's parents' home.

53. However, the family did not provide any evidence to support this wild theory, nor did Defendant Bogner inquire with the family as to the source of this theory that Riley had been shot somewhere other than his own residence.

54. During this conversation, while the family members expressed doubt that Riley committed suicide, these same family members advised Defendant Bogner that Riley made prior threats of self-harm, and that Riley had made prior suicide attempts.

55. Despite the lack of any evidence of a homicide, and with overwhelming evidence demonstrating that Riley died of suicide, Defendant Bogner nevertheless began a murder investigation, based solely on the family's speculation that this may have been a murder, not a suicide, even though he knew this information already proved to be demonstrably false.

56. Defendant Bogner not only had no evidence to support the family's homicide theory, he knew immediately the family's information was false, as he knew Riley died where his body was found, in the home of the Plaintiff's parents, where the couple were living.

57. In fact, Defendant Bogner later admitted in a deposition that the family's theory about Riley being killed somewhere outside of his home "didn't make sense to me."

58. Nevertheless, Defendant Bogner persisted in his homicide investigation.

59. The day after the incident, Defendant Bogner went to the home of the Plaintiff's parents.

60. The Plaintiff's parents voluntarily consented to interviews and to an inspection of their home. However, because Sgt. Gurgevich and the other responding police officers correctly concluded this was a suicide attempt and not a homicide, the scene was not preserved by the police, and thus the scene itself no longer had any evidentiary value, and Defendant Bogner knew this to be so.

61. The Plaintiff's parents' version of events supported the only credible explanation of what occurred – suicide –or at least their version of events gave Defendant Bogner no credible basis to believe this was a homicide.

62. The Plaintiff's parents did not see Riley shoot himself, but they responded to the garage area where the Plaintiff and Riley stayed shortly thereafter. Defendant Bogner learned during these interviews that the Plaintiff's father entered that room first, observed Riley with a gun in his hand, and that Alicia grabbed the gun and threw it away from him after he started coughing up blood. The Plaintiff's mother, meanwhile, indicated that by the time she walked in, the gun was no longer in Riley's hand, which is consistent with her husband's timing.

63. Defendant Lt. Bogner knew by this time that the scene had been fully cleaned and altered, and thus he knew when he photographed the scene in no way were these accurate representations of the area where Riley shot himself.

64. Nevertheless, Defendant Bogner attempted to re-create the scene in a manner he knew was completely unreliable.

65. Defendant Bogner took a photograph off Facebook that depicted that room then attempted to re-construct the scene based on after-the-fact witness interviews about their memory of the location of certain objects.

66. In the end, as of the time of Riley's death and shortly thereafter, Defendant Bogner had no credible basis to believe Riley died of a homicide, all credible evidence pointed to Riley dying of a suicide, and Defendant Bogner knew that any physical evidence or scene analysis was seriously compromised to the point of uselessness.

67. Yet, Defendant Bogner insisted on pursuing a baseless homicide investigation.

**Defendant Bogner Recruits Defendant Dr. Wang to Assist Him in Framing the Plaintiff**

68. Meanwhile, the Lake County Coroner's Office assigned Defendant Dr. Wang to perform an autopsy for the Coroner's Office.

69. Defendant Dr. Wang was not sufficiently qualified to conduct autopsies to determine whether deaths should be considered a suicide or homicide, and Defendant Pathology Consultants, Inc. knew this to be the case.

70. Upon information and belief, Defendant Pathology Consultants, despite knowing this, hired Defendant Dr. Wang, knowing he would perform these types of autopsies without the proper training, and deliberately chose not to give him the proper training and supervision to credibly make these types of determinations.

71. Defendant Dr. Wang and Defendant Bogner wrote up separate reports about the autopsy, and they contradict each other about when the autopsy occurred, and who was present.

72. According to Defendant Bogner's police report, Defendant Dr. Wang's autopsy occurred on December 6, 2017 at approximately 7:45 a.m. at the Lake County Coroner's Office, and Defendant Bogner was present for the autopsy, along with Lake County Coroner Investigator Stephanie Zormier, both of whom are law enforcement officers.

73. However, according to Defendant Dr. Wang's autopsy report, the autopsy occurred on December 7, 2017, at 9 a.m., and the only persons present were Elias Kavourinos and Hugo Barjas, his medical assistants, who are not law enforcement officers.

74. In Defendant Bogner's report, Defendant Bogner admitted to having a conversation with Defendant Dr. Wang about the lack of signs of stippling, powder burns, barrel burns, or soot

in the circular shaped entrance wound, and that Defendant Dr. Wang would not rule the death a suicide.

75. Defendant Dr. Wang testified in sworn testimony that his normal procedure is to *not* meet with law enforcement officers before the autopsy, and to only have them present during the autopsy, in case there are questions he has that may arise.

76. In this case, however, upon information and belief, Dr. Wang consulted with Defendant Lt. Bogner and Investigator Zormier the day before the autopsy, which is contrary to Dr. Wang's usual practice.

77. Furthermore, upon information and belief, Defendant Bogner convinced Defendant Dr. Wang to conclude this was not a suicide even before Defendant Dr. Wang conducted the autopsy.

78. Then, to make matters worse, Defendant Dr. Wang lied about this fact in his autopsy report by omitting any meeting with Defendant Bogner and Investigator Zormier the day before, on December 6, indicating in his official autopsy report that the only two persons present during his autopsy at 9 a.m. on December 7 were his medical assistants, making it appear as if he did the autopsy without the input of law enforcement, and omitting the fact that he had already agreed with Defendant Bogner to pre-determine this death not to be a suicide even before he began his autopsy.

79. In taking the above actions, and in the actions taken subsequently, Defendant Dr. Wang and Defendant Bogner, and/or other named or unnamed in this complaint, formed an agreement to frame the Plaintiff for murder and to falsify reports and/or events in furtherance of this conspiracy to deprive the Plaintiff of her constitutional rights.

80. Before conducting his December 7 autopsy, Dr. Wang was in possession of medical records for Riley's stay at the hospital, and thus he knew Riley was in the hospital for two days, that life-saving measures were performed at the hospital, and that these life-saving measures would have cleansed any remnants of stippling and/or gun-shot residue that would otherwise be used to determine whether a wound was close contact.

81. Before conducting the December 7 autopsy, Dr. Wang reviewed photographs of Riley's head after his stay at the hospital, and observed avulsion of brain matter, *i.e.* he knew that brain matter was squeezing through the bullet path out of Riley's head, thus likely or possibly pushing out evidence of soot or gunshot residue.

82. Dr. Wang knew the avulsion of brain matter occurred with Riley to an extensive amount.

83. Dr. Wang also noticed in those photographs that Riley's hair had been shaved away from that entrance wound.

84. Dr. Wang observed in these photographs that the entrance would area on Riley's head had been washed.

85. Dr. Wang knew this was the only bullet wound suffered by Riley, and that there was no exit wound.

86. Dr. Wang never attempted to collect or test any of the brain matter that was oozing out of the entrance wound.

87. Dr. Wang knew Riley stayed at the hospital for at least two days, and that some of this brain matter near the entrance wound would have been lost or destroyed during medical procedures.

88. Dr. Wang knew in this case there were a "number of reasons" why soot, gunshot residue and/or stippling may not have been present when he examined Riley's body, even if it was a contact or close-range shot, and he knew this before he conducted the autopsy.

89. Dr. Wang admitted in his deposition that, as a clinical matter, a forensic pathologist could not determine why there may not be soot present on a body, only that there was an absence of soot or gunpower.

90. Dr. Wang made his conclusion in his autopsy report that Riley died of a homicide based on his agreement with Defendant Bogner to classify this case as a homicide, knowing his report could be read by prosecutors deciding whether to bring charges against the Plaintiff, and knowing he had no medical basis to make such a conclusion, all in an attempt to conspire with Defendant Bogner to frame the Plaintiff for murder.

91. Defendant Dr. Wang's autopsy report was provided to Defendant Lt. Bogner on January 30, 2018.

92. Defendant Dr. Wang's report noted the toxicology report indicated Riley's toxicology was positive for alcohol and Tramadol.

93. Tramadol is a pain medication in the opioid class of drugs, and one of the side effects of taking this drug and/or withdrawing from the drug is suicidal ideation.

94. Dr. Wang knew the side effects of Tramadol and/or recklessly kept himself ignorant of this side effect by not researching the side effects of this drug.

95. Defendant Dr. Wang made no notation in his autopsy report as to the significance of these positive toxicology findings, knowing that such an explanation would undercut his

13

conclusion that this death was a homicide, not a suicide, and knowing that a prosecutor reviewing this report would not be readily aware of the side effects associated with Tramadol.

96. Defendant Dr. Wang concluded this was a homicide, a conclusion that was so unreasonable and unfounded that it amounted to bad faith, intentional misrepresentation and/or recklessness.

97. Defendant Dr. Wang knew all of the evidence in this case pointed to suicide, and there was nothing factual about this case that would even hint at homicide, other than his desire to please Defendant Bogner by going along with his unfounded homicide theory.

98. Defendant Dr. Wang derives a great deal of his income from assisting law enforcement in death investigations, and pleasing Defendant Bogner was due in part to his financial motives to please law enforcement officials to continue to gain employment in future death investigations.

99. The *only* evidentiary fact that Dr. Wang cited in his autopsy report in support of his baseless conclusion that this was a homicide was the absence of any visible soot deposition, muzzling imprint, or gunpowder stippling around the gunshot wound.

100. However, Defendant Dr. Wang knew when he came to this conclusion that there were many explanations consistent with a suicide determination for the lack of visible soot deposition, muzzling imprint or gunpowder stippling around the gunshot wound, including but not limited to Riley's head having been fully cleansed and surgically altered during life-saving measures, which would make the absence of stippling or gunshot residue an insignificant fact, certainly not one that would have justified a conclusion that this death was a homicide.

14

101. Defendant Dr. Wang knew that he could have extracted Riley's brain during the autopsy and performed an examination of the brain, which could have reveled evidence of gunshot residue within the brain that would tend to signify close-range firing, but instead Dr. Wang chose not to do this so as not to undercut his unfounded homicide conclusion.

102. Dr. Wang also knew he could have indicated in his report that an examination of the brain could have been done, but was not, knowing that including this information in his autopsy report would undercut his unfounded conclusion that this death was a homicide.

103. When Defendant Dr. Wang wrote up his report, knowing this would be tendered to the prosecutor in determining whether homicide charges would be lodged against the Plaintiff, he purposely failed to explain that the life-saving medical procedures described in the complaint would have explained the absence of gunshot residue or stippling, knowing this would have undercut his unfounded conclusion that this death was a homicide.

104. Defendant Dr. Wang did these actions intentionally and/or with recklessness, knowing that including the information would obliterate his unfounded opinion that this was a homicide, not a suicide, based solely on the lack of stippling or GSR, which he knew was not surprising given the fact that the area of the entrance wound had been scrubbed and surgically compromised.

105. Defendant Bogner also knew that Defendant Dr. Wang's conclusion that this was a homicide was unsupported because he knew of all the information described in this complaint that pointed to only one cause of death, suicide, and that the lack of stippling or gunshot residue was a useless fact in light of the life-saving measures that Riley endured.

106. Defendant Bogner also knew that Defendant Dr. Wang's conclusion was based on his urging and influence, yet he omitted any reference to this urging or influence in his reports, and allowed Defendant Dr. Wang's report that misstated the nature of their contacts go uncorrected with the prosecutors who were making the charging decision in this case.

107. Defendant Lt. Bogner and Defendant Dr. Wang both knew there was no evidentiary basis to conclude the cause of death was homicide, yet they formed an agreement with each other to present Riley's death as a homicide, not a suicide or at the least undetermined, knowing that the result of their unlawful agreement, was the likely charging of the Plaintiff with homicide, even though they each knew there was no evidentiary basis and/or probable cause to do so.

**The Plaintiff is Arrested and Charged with First Degree-Murder on October 23, 2018**

108. On October 23, 2018, Defendant Bogner sought and obtained a no-bond arrest warrant for murder, and also on that same date, Defendant Bogner arrested the Plaintiff on the no-bond murder warrant.

109. Upon information and belief, Defendant Bogner requested that the Lake County Prosecutor's Office charge the Plaintiff with murder, and made this request by misrepresenting the true nature of this case to the prosecutors, as described more fully above in this complaint, knowing there was no probable cause to charge the Plaintiff with murder.

110. Specifically, *inter alia*, Defendant Bogner submitted an affidavit in support of an arrest warrant that omitted critical information that went to the issue of probable cause, including any indication that all of the original first responders concluded this was a suicide attempt. Defendant Bogner also referenced a crime scene without explaining that this crime scene was worthless, and referenced Dr. Wang's autopsy findings without mentioning his influence over this

16

finding, and without referencing the numerous reasons why the lack of stippling, soot or gunpowder is virtually meaningless, given all of the information referenced in this complaint, including the life-saving measures that were taken at the hospital.

111. Defendant Bogner also took extraordinary measures to suppress evidence that all of the original responding officers concluded the incident was a suicide.

112. In a deposition taken after the filing of criminal charges, Officer Bunnell testified that Defendant Bogner told him not to upload supplemental reports onto the Spillman database.

113. This directive is against department protocol, and was done with the intention of not uploading exculpatory police reports onto the Merrillville Police Department's computerized database that serves as a conduit for reports being relayed to the Lake County Prosecutor's Office. These suppressed police reports explained why the responding officers all concluded this was a suicide, and this suppression was done with the intention that the prosecutors would not have access to these documents, at least not during the time period in which the prosecutors were deciding whether to bring criminal charges.

114. The Plaintiff was arrested and taken into custody by Defendant Bogner on October 23, 2018, and then transported to Lake County Jail where she was incarcerated more than one month until she was released on $5,000 bond.

115. Discovery was exchanged, and some depositions were conducted.

116. Those depositions revealed how there was no basis to conclude this was a homicide.

117. The criminal charges were pending against Plaintiff for more than three years until the Lake County Prosecutor's Office dismissed all charges against Plaintiff on February 25, 2022 in a manner consistent with the innocence of the Plaintiff.

118. All such charges were expunged from Plaintiff's record with the agreement of the Lake County Prosecutor's Office.

119. The Plaintiff suffered extreme emotional distress as the proximate result of the actions of the Defendants, damages related to being falsely incarcerated, reputational damages, damages related to the affect this had on her custodial relationship with her minor children and her relationship with them, as well as economic and pecuniary damages.

120. The Plaintiff brings a Section 1983 claim of malicious prosecution under the Fourth Amendment to the United States Constitution, a Section 1983 claim of malicious prosecution and/or fabrication of evidence under the Fifth Amendment to the United States Constitution, and a Section 1983 civil conspiracy claim to violate the Fourth and Fifth Amendment rights of the Plaintiff against Defendants Bogner and Dr. Wang.

121. Defendant Pathology Consultants, Inc. is being sued on a *respondeat superior* basis of liability as to the actions of Defendant Dr. Wang, and also for *Monell* liability for its deliberate indifference in its practices of hiring and training Defendant Dr. Wang, who was Defendant Pathology Consultants, Inc. knew or should have known Dr. Wang was unqualified to perform in this case.

122. Defendant Lake County is being sued on an indemnification theory of liability as to the actions of Defendant Dr. Wang, additionally and/or alternatively to any indemnification that may be required and/or authorized by Defendant Pathology Consultants, Inc.

123. Defendant Town of Merrillville is a municipal corporation located in the County of Lake, in the State of Indiana, and is being sued for indemnification purposes for the actions of Defendant Bogner.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and § 1988, the Plaintiff demands compensatory damages from the Defendants, and because Defendants Bogner. Dr. Chen and Defendant Pathology Consultants, Inc. acted intentionally, maliciously, and/or recklessly, substantial punitive damages against these Defendants, plus the costs of this action, plus attorneys' fees and other and additional relief as this Court deems equitable and just.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,

*s/Richard Dvorak*
Richard Dvorak,
An Attorney for the Plaintiff

Richard Dvorak
Adrian Bleifuss Prados
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
(630) 568-3190 (p)
(312) 873-3869 (f)
richard.dvorak@civilrightsdefenders.com

Jeffrey D. Naffziger
MCHARGUE & JONES, LLC
105 W. Madison St., Suite 1600
Chicago, IL 60602
(312) 739-0000 (p)
(312) 739-0422 (f)
Indiana Attorney No. 30057-45
jnaffziger@mcharguelaw.com